**CITIZENS FOR A BETTER GRETNA, et al.**

v.

**CITY OF GRETNA, LOUISIANA, et al.**

**Civ. A. No. 84–4901.**

United States District Court, E.D. Louisiana.

May 12, 1986.

Alice M. Jacobs, Suzanne Weiner, Jack W. Jernigan, Ronald L. Wilson, New Orleans, La., for plaintiffs.

Jon A. Gegenheimer, City Atty., City of Gretna, Gretna, La., for defendants.

## OPINION

ROBERT F. COLLINS, District Judge.

When Congress passed the Voting Rights Act[1] in 1965 to eliminate voting discrimination and to affirm the fundamental right of each citizen to participate fully in elections, President Lyndon Johnson hailed its enactment as a "triumph for freedom as huge as any ever won on any battlefield."[2] The weapon Congress utilized to secure that freedom was Section 2 of the Act, which created a right of action for private citizens or the government to challenge discriminatory voting practices or procedures.[3] This case evokes a consideration of the extent to which plaintiffs have properly used that weapon (in its amended form) to attack the election procedure of the Board of Aldermen for the City of Gretna, Louisiana. Specifically, the Court is called upon to determine under what circumstances does a governmental election scheme operate to minimize or cancel out the voting strength of racial minorities within the City of Gretna.

This class action is brought pursuant to Section 2 of the Voting Rights Act of 1965 and the Voting Rights Act amendments of 1982, 42 U.S.C. § 1983 and the Fourteenth and Fifteenth Amendments of the United States Constitution. Plaintiffs, Jerome Black, Noreen V. Boyd, Sylvester Brown, Burnell Darensburg, Jr., Alex Gourgis, Sr., Bernice Gourgis, Warren G. Lombard, Leo Jones, Charles L. Mar, Verta M. Mar and Sammie Walker, are all black citizens of the United States and the State of Louisiana. They are residents of the City of Gretna and are registered to vote there. Citizens for a Better Gretna is an unincorporated association of citizens of the City of Gretna. Its members include the above named plaintiffs. The plaintiffs sue individually and as representatives of the class of black registered voters of the City of Gretna, Louisiana.

The City of Gretna is a municipal corporation formed under the laws of the State of Louisiana, particularly the Lawrason Act, LSA–R.S. 33:51 et seq. As such, it is a political subdivision of the State of Louisiana. Defendant, William J. White, is the Mayor and Chief Executive Officer of the City of Gretna, and he is sued both in his individual and official capacities. James Bush, Sr., Salvadore Marchese, Jr., Louis LeBoeuf, Jr., Gerard E. Schexnayder and Hubert F. Uzee are Aldermen of the City of Gretna, and they are sued both in their individual and representative capacities.

---

1. Pub.L. No. 89–110, 79 Stat. 437 (codified as amended at 42 U.S.C. §§ 1971, 1973–1973bb–1 (1976)) (further amended by the Voting Rights Act Amendments of 1902, Pub.L. No. 97–205, 96 Stat. 131) (codified at 42 U.S.C.A. §§ 1973, 1973b, 1973aa–1a–6 (West Supp.1983))).

2. Senate Comm. on the Judiciary, Report on S. 1992, S.Rep. No. 417, 97th Cong., 2nd Sess. 4 [hereinafter cited as S.Rep.], reprinted in 1982 U.S.Code Cong. & Adm.News 177.

3. See, *Section 2 of the Voting Rights Act: An Analysis of the 1982 Amendment,* McKenzie & Krauss, 19 Harvard Civil Rights—Civil Liberties Law Review 155 (Winter 1984).

Jurisdiction is conferred on this Court pursuant to 42 U.S.C. § 1973j(f) and 28 U.S.C. §§ 1331, 1343 and 1344.

The gravamen of plaintiffs' claim is that the "at-large" election system, together with the majority vote requirement for election to the Board of Aldermen (LSA–R.S. 18:511 A), currently employed by the City, effectively prevents blacks from participating in the political process in a reliable and meaningful fashion in two basic ways. First, it ensures that the white voters will continue to elect all members to the Board of Alderman, while blacks will continue to have neither the opportunity nor ability to be elected; and secondly, by doing so, it operates to minimize or cancel out the black voting strength in the City by denying blacks the opportunity to elect blacks to the Board of Aldermen, even though they comprise a significant portion of the total population of the City—all in a manner that violates rights of the plaintiffs secured by Section 2 of the Voting Rights Act of 1965, amended June 29, 1982, 42 U.S.C. § 1973 (Section 2 of the Voting Rights Act), 42 U.S.C. § 1983, and the Fourteenth and Fifteenth Amendments to the United States Constitution.

█ This Court concludes, on the basis of factual findings, that the "at-large" system of election to the Board of Aldermen in the City of Gretna violates Section 2 of the Voting Rights Act, and that plaintiffs are therefore entitled to appropriate relief, including an order enjoining defendants from conducting elections under the existent "at-large" system. Because the Court upholds plaintiffs' claim for relief under Section 2 of the Voting Rights Act, it need not address their other statutory and constitutional claims seeking the same relief.

*The Standard of Proof under Section 2*

The language of Section 2(b), supplemented by its legislative history, provides the standard of proof for finding a Section 2 violation. The Senate Report delineates specific factors which a court should consider in determining whether the political process of a state or subdivision thereof violates Section 2. In determining whether, "based on the totality of circumstances," a subdivision electoral mechanism does so "result" in racial vote dilution, Congress intended that courts should look to the interaction of the challenged mechanism with those historical, social and political factors generally suggested as probative of dilution in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and subsequently elaborated by the former Fifth Circuit in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom., East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam). These factors typically include, per the Senate Report accompanying the compromise version enacted as amended Section 2:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.[4]

*"Zimmer Factors"*

The Court finds the following circumstances to have contributed to dilution of minority voting strength in Gretna by use of the at-large scheme for election of aldermen and incorporates them as Findings of Fact in this case.

## FINDINGS OF FACT

*Past Discrimination and Its Lingering Effects*

A history of discrimination is important evidence of both discriminatory intent and discriminatory result. Past discrimination can severely impair the present-day ability of minorities to participate on an equal footing in the political process. Past discrimination may cause blacks to register or vote in lower numbers than whites. Indeed, past discrimination may manifest itself in present-day socio-economic disadvantages, which in turn can reduce participating and influence in political affairs. The historical record of discrimination in the State of Louisiana and the Parish of Jefferson is undeniably clear, and the record suggests it has not ended even now.

The history of black citizens' attempts, in Louisiana since Reconstruction, to partic- ipate effectively in the political process and the white majority's resistance to those efforts is one characterized by both *de jure* and *de facto* discrimination. Indeed, it would take a multi-volumed treatise to properly describe the persistent, and often violent, intimidation visited by white citizens upon black efforts to participate in Louisiana's political process. Plaintiffs' expert, historian Dr. Raphael Cassimere, has traced that history very clearly and cogently to its genesis-slavery.

Disenfranchisement of blacks as an acknowledged state policy pre-dates the Civil War. Even free blacks who were property owners, were denied the right to vote. Most blacks, consequently, even while ostensibly "free," remained enslaved, bereft of one of the most basic of human rights— the right to vote.

With the advent of post-Civil War Reconstruction and the emancipation of slaves, federal intervention[5] led to some desegregation of schools, integration of public facilities and perhaps most importantly, registration and political participation for blacks within the state. Black suffrage flourished from 1867 to 1898. Black persons were elected to state office, including the position of lieutenant governor. Three black persons were elected to Congress, although only one of them was ever seated.[6] The white population reacted to the

---

**4.** Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

While these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution. S.Rep. No. 97–417 at 28–29, U.S.Code Cong. & Adm.News 1982, pp. 206–207 (footnotes omitted).

**5.** Section 2 of the Fourteenth Amendment promised southern states more representation in Congress if they would repeal laws excluding blacks from voting. Later Congress passed more profound provisions within the Fifteenth Amendment, which precluded state authorities from denying—or abridging—the right of citizens to vote on account of race, color, or previous conditions of servitude.

**6.** *See, Major v. Treen,* 574 F.Supp. 325, 340 (E.D. La.1983), testimony of Dr. Raphael Cassimere: "With the advent of post-Civil War Reconstruction, black males were permitted to register. Between 1868 and 1896 many black state legislators were elected. Two blacks were elected Lieutenant Governor and one, P.B.S. Pinchback, was selected by the state Senate to fill a vacancy in that position and later served as Acting Governor. Pinchback subsequently was selected to serve in the United States Senate but was not seated. Three blacks claimed seats in the United States House of Representatives but only one, Charles E. Nash, was seated." *Id.* at 340. See also, J. Morgan Kousser, The Shaping of Souther Politics: Suffrage Restriction and the Establishment of the One-Party

enfranchisement and social elevation of blacks by forming white leagues to challenge the legitimate state government which had previously been elected by a heavily black electorate. Inevitably, racial tensions sparked violence throughout the State. In 1877, when the federal government ceased to monitor state government, the White League, previously held in check, assumed legislative control of the state.

Consequently, the period of enfranchisement for blacks which lasted approximately 30 years gradually came to an end. By 1898, thanks in no small part to the drafting of a new constitution, blacks were completely disenfranchised in the State of Louisiana. The Constitution of 1898 created a registration provision which included both education and property requirements; that is, unless the individual was exempted by the so-called "grandfather" or "fighting grandfather" clauses. The provision, designed to purge blacks from the registration rolls, proved to be extremely effective. For example, in 1897, there were over 130,-000 black registered voters; by 1900, only 3 years later, less than 5,000 black persons remained on the voter rolls.

Following the Supreme Court's invalidation of the grandfather clause in 1915, *Guinn v. U.S.*, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915), the state legislature drafted a constitution with a suffrage provision which included an interpretation and good morals test. These tests were rarely used during the first 23 years of existence because the party in control, the Democrats, held white-only primaries. Blacks were denied the right to seek office or cast a ballot in any Democratic primary thus prohibiting black participation in the electoral process. The interpretation test was not enforced because it was not necessary to exclude blacks; they were already effectively excluded.

White primaries, however, were abolished in 1944 again igniting statewide enforcement of the interpretation test. In 1954, due to increased black registration, vigorous enforcement of this test was encouraged by a Joint Legislative Committee of the Louisiana legislature. However, because of the small number of black persons living in Jefferson Parish, it was unnecessary for the registrar strenuously to enforce such test.

Beginning with the 1950's and continuing until sometime after the interpretation test was invalidated in 1963, Jefferson Parish blacks, unlike whites, were required by the registrar to state their age exactly in terms of number of years, months and days, and to recite the preamble to the United States Constitution in order to register to vote.

*Effects of Discrimination in Facilities, Education, Employment, and Housing*

Like other southern states, prior to the passage of the federal Civil Rights Act in 1964, all public facilities, including courthouses, public accommodations, transportation, recreational facilities, schools,[7] and shops were racially segregated throughout Louisiana, some were segregated as late as the 1970's. Blacks were systematically denied access to restaurants, forced to sit in the rear of buses and subjected to separate and unequal facilities. That these disabilities, generally experienced by blacks throughout the State of Louisiana were also experienced by black residents of Gretna, was convincingly attested to by several of the witnesses.[8]

South, 1880–1910 (New Haven, Conn., Yale University Press, 1974).

**7.** Despite the Supreme Court's ruling in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), school boards throughout the state refused to desegregate in the absence of a court order. Cf. *Major v. Treen,* 574 F.Supp. at 340.

**8.** Plaintiffs' witnesses, Charles and Verta Mar, lifelong residents of Gretna, testified to the grinding details of everyday life in a segregated system for blacks. Segregation on buses, for example, was enforced with a screen behind which blacks were forced to sit. If a white person chose to move the screen backwards, the black passengers had no choice but to relinquish their seats. Water fountains, restrooms were not only segregated, but those for the blacks were frequently in deplorable condition. Mrs. Mar testified that blacks had to enter restaurants from the rear and were prevented from physically entering certain stores. If they

Schools in Jefferson Parish remained segregated until 1971, when integration was ordered by the court in *Dandridge v. Jefferson Parish School Board*, 332 F.Supp. 590, *application denied*, 404 U.S. 1219, 92 S.Ct. 18, 30 L.Ed.2d 23, aff. 456 F.2d 552, *cert. denied*, 409 U.S. 978, 93 S.Ct. 306, 34 L.Ed.2d 240. The Parish response to the *Dandridge* threat of racial integration was to institute sexual segregation at the high school level. Not until 1978 in *Helwig v. Jefferson Parish School Board*, C.A. No. 74–2143 (unpublished Opinion) (E.D.La.1978), did the Court order these schools be completely integrated.

Plaintiffs' historian, Dr. Raphael Cassimere, testified that throughout the years of separate school systems, facilities and instruction provided to black children were qualitatively inferior to those provided to whites. Blacks were forced to attend Rosenwald High School in Marrero which was not only substandard but also uncertified, which meant that its graduates had extreme difficulty in getting into college.[9] In contrast, white students attended an accredited high school within the City of Gretna.

Due in part to the segregated pattern of public education and the general inferiority of *de jure* segregated black schools, the legacy of this system persists even today in Gretna. While a majority of whites over age 25 possess a high school education (54%), only 40% of blacks over age 25 are high school graduates.

Black citizens of Gretna have historically suffered disadvantages relative to white citizens in public and private employment,

due in some measure to inadequate education. Blacks generally suffer higher incidences of unemployment and hold lower paying jobs than do whites. In 1980, the median family income for whites in Gretna was $18,524. For blacks, the median income was $9,721, only 52% of the median family income for whites. Only 9.7% of whites in Gretna lived below the poverty line but 34.1% of blacks lived below the poverty level. In 1979, 5.5% of all whites over 16 in the labor force in Gretna were unemployed. For blacks, the figure was 13.3%, more than double that of whites.

Similarly, city hiring patterns underline and perpetuate racial discrimination in Gretna. Despite a 28% black population, only 17% of municipal jobs are held by blacks. None of these are supervisory. Moreover, where only 5% of white city employees are classified as laborers, a full 32% of all black employees of the City of Gretna are classified as laborers. The Gretna Police Department has 86 employees, only five of whom, or 5.81%, are black.

Comparatively, residential housing patterns in Gretna, as with other cities and states with histories of *de jure* segregation, have traditionally been separated along racial lines. That pattern persists today in Gretna. Virtually all residential neighborhoods are racially identifiable. Blacks are consistently concentrated in low income areas and are conspicuously absent from the more affluent areas of Gretna. The evidence presented at trial further shows that the City of Gretna has done little to help alleviate this problem.[10]

wished to make a purchase, they were forced to use an exterior window. Parks in the city were segregated and swimming pools were kept segregated until 1973.

**9.** Mrs. Mar testified that instead of continuing at Rosenwald she commuted to an Orleans Parish School—a two hour commute each day.

**10.** In an effort to counter plaintiffs' evidence concerning the effects of discrimination, defendants called two administrators connected with the federally funded Community Development Office: Emmanuel Brown, the Director of that program for Jefferson Parish, and Paul

Richards, Director of Development for Gretna, testified concerning the City's use of federal funds for projects in low and moderate income areas of the city. Their testimony was apparently offered to show that the projects helped mitigate the lingering effects of historical discrimination because they had some impact on the black community. However, since defendants admitted that the money comes entirely from the federal government; that defendants are required to target funds in "lo-mod" areas in order to obtain them; that the funds constitute in any one year no more than 6% of the Gretna city budget; that Jefferson Parish and not Gretna has the final say concerning which projects

*Voting Patterns in Municipal Elections*

Defendants urge that any official discrimination that may have existed in Gretna prior to the adoption of the Voting Rights Act in 1965 has not impeded black political participation today and consequently "there is no lingering impact of any past discrimination."[11] The record fails to support this conclusion.

While blacks are registered to vote at a rate equivalent to white residents of Gretna, they constitute a much smaller proportion of the actual electorate participating in aldermanic elections because turnout among black registered voters has been substantially below that of white registered voters. Plaintiffs' expert witness, political scientist Dr. Richard Engstrom, presented the following analysis of turnout in the three most recent aldermanic elections. He testified that while blacks constituted 24.7% of registered voters, in 1981, 1979 and 1977, they comprise respectively only 16.3%, 19.7% and 14% of all participating voters. The differences in turnout rates are 21.7% in 1981 (35.8 percent of registered blacks who turned out to vote against 57.5% percent of registered whites who turned out to vote), and 26% in 1977 (based on a weighted regression estimate of 35.9 percent turnout for blacks and 61.9 percent turnout for whites). Another measure of participation, in aldermanic contests where blacks ran, was to calculate the number of votes for aldermanic candidates cast by members of each racial group as a percentage of the possible number of votes for the aldermen that group members could have cast given their registration. For example, in 1981, whites cast 54.6 percent of the votes they could have cast, but blacks cast 18.4 percent for a difference of 36.1 percent. In 1977, whites cast 59.3 percent and blacks cast 26.1 percent of their possible votes for a difference of 33.2 percent. Whether the measure of participation is simply turnout at the election or the percentage of possible aldermanic votes cast, substantial differences in participation rates consistently appear in the aldermanic elections in Gretna.[12] Thus it is axiomatic "when minorities are faced with almost total exclusion from the ordinary channels of political participation and deprived of any alternative means of exerting influence, their voter turnout and candidacy rates tend to drop." *See*, Minority Vote Dilution 15 (C. Davidson ed. 1984).

Of all the socio-economic factors treated in the above findings, the status of black citizens as a group is lower than that of white citizens as a group. This is true throughout Jefferson Parish, and it is true with respect to the City of Gretna. This lower socio-economic status gives rise to special group interests centered upon those factors. At the same time, it operates to hinder the group's ability to participate effectively in the political process and to elect representatives of its choice as a means of

are funded, it is difficult to comprehend what, if anything, such testimony says about Gretna's attempts to better housing and other socio-economic conditions for blacks.

11. Defendants' Post Trial Brief at 9, paragraph 38.

12. Plaintiff's expert historian, Dr. Cassimere, offered one of several possible answers for lower black turnout in aldermanic elections. Dr. Cassimere testified that elected chiefs of police in Louisiana towns and cities are perceived generally by black communities to be extremely powerful. The Police Chief in Gretna, Beauregard Miller, was Chief from 1925 up until his death in 1976, when his son Beauregard Miller, Jr. was appointed to replace him. Miller, Jr. was elected Police Chief the next year and remains in office to this day. Mr. Mar testified that the Millers were perceived by the black community as "power." "We knew no Board of Aldermen, no Mayor," he said. In his mind and in the minds of other witnesses, the Chief was the government. Dr. Cassimere explained that the apparent right to freely arrest makes the chief and the police organization especially fearsome to the black community, which, lacking the education to know its rights, perceives correctly that its members are powerless in the hands of the police. Mr. and Mrs. Mars testified that the perception of the Miller control of the City remains current in the black community and that while they always voted in state and national elections, they rarely vote in most municipal elections because of the perceived futility of their vote.

seeking government's awareness of and attention to those interests.[13]

Both Congress and the Courts have recognized the effect lower socio-economic status has on minority participation in the political process. The Senate Report states:

> "The courts have recognized that disproportionate educational[,] employment, income level[,] and living conditions arising from past discrimination tend to depress minority political participation.... Where these conditions are shown, and where the level of black participation is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation."

1982 Senate Report at 29 n. 114, U.S.Code Cong. & Adm.News 1982, p. 207. *See also, Major v. Treen,* 574 F.Supp. 325, 351 (E.D. La.1983).

In sum, the depressed levels of income, education and employment are a consequence of severe historical disadvantage. Depressed levels of participation in voting and candidacy are inextricably involved in the perception of futility and impotence such a history engenders. These historical disadvantages continue through the present day and undoubtedly hinder the ability of the black community to participate effectively in the political process within the City of Gretna.

*The Extent of Election of Black Citizens to Public Office*

It appears from the record that no black person has ever been elected to municipal office in Gretna. Indeed, in the entire history of Gretna, only two black persons

have run for municipal office (Edwin Romain in 1973 and Leo Jones in 1977 and 1979 for Alderman). This is in distinct contrast to the white community which, despite the overwhelming success rate of the Miller-White factions,[14] turns out a large group of candidates for municipal elections. In 1973, thirteen white non-incumbent candidates ran for Alderman. In 1977, six white non-incumbent candidates ran for aldermanic office. In 1979, six white non-incumbent candidates ran for one seat against a seventh with strong Miller-White identification indicia.

■ Where members of the minority group have not been elected to public office, it is of course evidence of vote dilution. *U.S. v. Marengo County Com'n.,* 731 F.2d 1546, 1571 (5th Cir.1984). Section 2(b) explicitly permits the court to consider "[t]he extent to which members of a protected class have been elected," but in the next breath warns that the statute does not establish a right to proportional representation. 42 U.S.C.A. § 1973(b) (West Supp. 1983). Less than proportional representation does not automatically violate Section 2. However, the election of even one or a small number of minority elected officials will not compel a finding of no dilution. *Id.* at 1572.[15] As Judge Gewin cautioned in *Zimmer v. McKeithen,* 485 F.2d 1297, 1307 (5th Cir.1973):

> "Were we to hold that a minority candidate's success at the polls is conclusive proof of a minority group's access to the political process, we would merely be inviting attempts to circumvent the Constitution. This we choose not to do. In-

---

**13.** "Section 2 claimants are not required to demonstrate by direct evidence a causal nexus between their relatively depressed socio-economic status and a lessening of their opportunity to participate effectively in the political process." *Gingles v. Edmisten,* 590 F.Supp. 345, 363 (E.D. N.C.1984), n. 23; S.Rep. No. 417, 97th Cong., 2d Sess. 193 (1982), U.S.Code Cong. & Adm.News 1982 p. 177.

**14.** *See,* p. 1122, infra.

**15.** *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) specifically notes:

"Such success might, on occasion, be attributable to the work of politicians, who, apprehending that the support of a black candidate would be politically expedient, campaign to insure his election. Or such success might be attributable to political support motivated by different considerations—namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution grounds." *Id.* at 1307. *See also, National Association for the Advancement of Colored People v. Gadsden County School Board,* 11 Cir.1982, 691 F.2d 978, 983.

stead, we shall continue to require an independent consideration of the record." So too, this case requires the Court to make an independent consideration of the record.

As noted earlier, no black person has ever been elected to the Board of Aldermen of Gretna since its incorporation in 1913. Nevertheless, defendants argue black citizens have elected candidates of their choice to the Board of Alderman with regularity because Gretna's white officials have always received a significant portion of the black vote and the support of Gretna's black political organizations.[16] That argument is spurious at best—and at the very least calls to note an anecdote once attributed to Henry Ford. The author notes:

> "At first it was possible to buy Model T touring cars that were painted red and roadsters that were painted gray, but in mid-1909, under pressure to build as many cars as possible, the color for all Model Ts became dark green with black trim and red striping. In 1912, with demand for the car still rising and the urgent need for even greater standardization and simplification, Ford made this famous statement, 'Any customer can have a car painted any color he wants so long as it is black.' Thereafter, only black cars poured out of the Highland Park factory."

Barry, James P. *Henry Ford and Mass Production,* 55 (Franklin Watts, Inc., New York, 1973).

Implicit also within defendants' assertion that black voters in Gretna have elected candidates of their choice is the suggestion that at least one of the two black candidacies—that of Leo Jones—was simply token because he was not endorsed by two local black political organizations—the Westside Citizens' Committee and the Black Caucus, in 1977 or 1979. A review of the record and the campaign for these periods does not support such a finding.

In the 1977 aldermanic election, Jones competed with 11 white candidates. All the candidates, including Jones, were registered Democrats.[17] His overall vote of 1,159 left him in ninth place in the balloting, 1,943 votes behind the candidate who was ultimately elected. In the 1979 special election, held for a single seat, Jones competed against seven white candidates. His overall vote of 756 (13.3% of the total vote) left him a distant fourth in the election. The two leading candidates who were forced into a runoff received 1,544 and 1,430 votes, 788 and 674 more votes, respectively, than Jones.

The Court finds that Jones was a viable and legitimate candidate with considerable name recognition in both the 1977 and 1979 elections. His campaign expenditures in those elections were roughly equivalent to the other candidates, including the winners. For example, Jones testified that he spent $1,500 and $2,500 in 1977 and 1979, respectively. All candidates in both elections with the exception of Kate Ward[18] and Salvadore Marchese filed affidavits with the State attesting that they had spent under $5,000 in campaign expenditures. The winner of the 1979 election, Salvadore Marchese, filed an affidavit evidencing expenses of $2,633 for the primary election.

The record also shows that Jones was an active campaigner as well.[19] In both campaigns, he printed thousands of cards and yard signs which he distributed as he campaigned.[20] In the 1977 campaign, Jones offered himself to the voters as a leader

---

**16.** The organizations which defendants refer to are the West Side Citizens' Committee and the Black Caucus. These organizations invite candidates to speak and to be interviewed to determine who the groups will endorse.

**17.** Thus, party identification was not a factor in the 1977 election.

**18.** Ms. Ward filed an affidavit listing campaign expenditures of $2,184.00 for 1977.

**19.** Jones was a frequent contributor to the local newspaper, the West Bank Guide. By the time of the October 27, 1979 primary election, Jones had published seven letters to the Editor on issues relevant to the electors.

**20.** The cards contained Jones' picture, his name and his ballot number as well as statements about his political activity.

with experience in government (former deputy sheriff with the Jefferson Parish Sheriff's Department) and civic groups (executive director of the Park Village Civic Organization).[21] His platform included advocating, among other things, Civil Service for all city employees, advertising for bids on all city contracts in the official journal, providing a system of large and small fully equipped playgrounds using a Block Grant and other federal funds, and the revitalization of the Central Business District with the cooperation of business and industry.

Jones testified that he campaigned vigorously in every precinct in both elections, going from house to house and covering at least 80 percent of the houses with registered voters which he estimated to be about 2,400 households. He testified that he took leave from work for the race and campaigned heavily on evenings and weekends. For the 1977 election, he campaigned for two months. Indeed, for the 1979 aldermanic race, Jones was the first candidate to announce his candidacy in the local newspaper. He testified that he campaigned for three months actively in both predominantly black and predominantly white neighborhoods of Gretna.[22]

Thus, the failure of one black candidate to receive the endorsement of a particular black political organization, while it may have demonstrated that some white candidates received black support, certainly does not suggest that his candidacy was a token one. The endorsement by these organizations might, on occasion, be attributable to political support motivated by different considerations—namely, that there is little optimism that a black could win an election under Gretna's current aldermanic election scheme. The fact remains that despite the strong candidacies of two qualified blacks on three separate occasions, no black has ever won an aldermanic election. This evidence can be interpreted only as strong evidence of dilution.

*Access to the Slating Process*

"In jurisdictions where there is an influential official or unofficial slating organization, the ability of minorities to participate in that slating organization and to receive its endorsement may be of paramount importance." *U.S. v. Marengo County Commission*, 731 F.2d at 1569. Politics in the City of Gretna is characterized by a constant reference to an informal group of elected officials known as the "Miller-White Ticket." The Millers, father and son, have been consecutively Chief of Police for a period of 60 years without interruption. Beauregard Miller, Sr. became Chief in 1925 and served for 50 years until his death in 1976. His son, Beauregard, Jr., was appointed at his death and elected Chief in 1977. William White has been mayor of Gretna since 1951, a total of 34 years.

There exists some controversy among the parties as to whether in fact the Miller-White faction is in fact a slating group. Defendants object to plaintiffs' characterization of the "Miller-White Ticket" as a slating group. Rather, they argue, "it is an endorsement group, since it does not recruit candidates for office and/or run endorsed candidates as a slate."[23] Moreover, defendants urge, the "Miller-White Ticket" is not affiliated with any political organization; nor does it consider itself as representative of any formal group. However, whether in fact the Miller-White Ticket is nonpartisan is of little importance in determining whether it is a slating group. Indeed, a nonpartisan slating group has been defined as "an organization whose purpose is to recruit candidates, nominate them, and campaign for their election to

---

21. See, Plaintiffs' Exhibit P–13.

22. The other black candidate for Alderman, Edwin Romain, who ran in 1973, also campaigned strongly for the 1973 aldermanic election. He was endorsed by the West Side Citizens Committee. In the primary election, Romain finished sixth out of seventeen candidates, high enough to qualify him for the runoff election. However, in the runoff, he finished last in the race.

23. *See,* Defendants' Post Trial Memorandum, p. 29. Testimony of Dr. Wilgen.

office in a nonpartisan election system".[24] However, what is important, and quite evident from the record, is the fact that although no formal recruiting process exists, there does exist a more informal slating process which generally ensures a white candidate for every office. Plaintiffs have presented, very cogently and convincingly, evidence that the black community has been effectively excluded from the informal slating process that is carried on in Gretna. Aldermen Uzee and Edwin Romain testified that in 1973 when there were two aldermanic seats open, a meeting was held in a local restaurant, to which all non-incumbent candidates were invited except Mr. Romain, the black candidate. Chief Miller, Sr. chaired the meeting; he offered the endorsement of the Miller-White group to all candidates who would endorse the rest of the Miller-White Ticket.[25] A few of the white candidates accepted the offer and were invited to a second meeting the next day to be interviewed by Mayor White. Two were chosen to run with the Miller-White Ticket: Mr. Uzee and Mr. Bush. These two were elected and serve to this day on the Board of Aldermen.

Salvadore Marchese, winner of a 1979 special aldermanic election, testified that the first time he ran the Miller-White Ticket endorsed no one. On cross examination, however, when confronted with his own campaign advertisement endorsing Miller for Chief of Police, he admitted that his campaign did receive some support from the Miller-White faction.

As a factual matter, blacks in Gretna are completely excluded from representation on the Miller-White Ticket. It is extremely difficult to win an aldermanic election without the Miller-White endorsement.[26] Indeed, defendants have admitted that each time the Miller-White faction has endorsed a candidate for the Board of Aldermen, that candidate has won. The black candidate, Edward Romain, testified he approached several of the incumbent aldermen seeking their support in 1973. He was told that the person to see was Chief Miller. When he spoke to Chief Miller he was informed that he could not be on the slate, that he was not needed to get the black vote. Thus, Miller refused to endorse Romain despite the fact that Romain had considerable support in the black community, including the endorsement of the West Side Citizens Committee.

While it is true that some members of the Miller-White Ticket do receive support from the black community, the opposite is not true. That is to say, there is no evidence to show that blacks have any choice in determining what issues or candidates should or should not be endorsed by the Miller-White Ticket. If participation is to be labeled "effective" then it certainly must be a matter of right, and not a function of grace. *See, Graves v. Barnes*, 343 F.Supp. 704, 726, *affd.* in *White v. Register*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). Evidence presented at trial clearly

---

**24.** *See, Minority Vote Dilution* at pg. 119. Black Law Dictionary defines a slate as simply "[a] list of candidates for public office or for positions on board of directors." *Id.* at pg. 1245. In *Minority Vote Dilution* the authors caution against misconstruing the term "nonpartisan" when discussing the nature of a particular slating group. They note:

"it should be said at the outset that the term nonpartisan in this context is misleading. Students of nonpartisanship have long been aware of its ambiguous meaning. On the one hand, it refers to a system in which candidates' party affiliation is absent from the ballot. 'Ballot nonpartisanship' in this sense must be distinguished from systems of 'participatory nonpartisanship' in which political parties are not involved in campaigns. Obvi-

ously ballot nonpartisanship is entirely compatible with participatory partisanship, as when the Democratic and Republican county committees either formally or informally work in behalf of a local candidate whose party affiliation is not on the ballot. In other words, it is possible to have 'party politics' in a system of ballot nonpartisanship".

*Id.* at 120.

**25.** The ticket included, among others, Miller for Chief and White for Mayor.

**26.** There are some white candidates who have in more recent years won election without the Miller-White endorsement; however, not without some difficulty and costly efforts.

show that the black community in Gretna participates in the slating process in only a minimal and indirect measure.

*Enhancing Factors*

A vote dilution case "is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts". *Zimmer,* 485 F.2d at 1305.

This Court finds that the entire voting population of the City of Gretna constitutes an unusually large election district for the purposes of electing the members of the Board of Aldermen. Gretna is the largest city by population in Louisiana that elects its governing body at large. With a population of 20,615 persons, the city is 4,501 larger in population than the next largest city in Louisiana that elects its governing body at-large (Morgan City at 16,114 persons). In Louisiana, over 90 percent of the municipalities with governing authorities elected at large have populations under 4,123.

Gretna's elections in general are governed by the Louisiana Election Code, LSA–R.S. 18:1 *et seq.* Gretna has a majority vote requirement for election to office. The number of votes required to elect candidates in Gretna is determined by LSA–R.S. 18:511, which provides in relevant part:

A. *Majority Vote.* A candidate who receives a majority of the votes cast for an office in a primary election is elected. If there are two or more offices of the same character to be filled, the number of votes necessary to constitute a majority shall be greater than the result obtained by dividing the total votes cast for all of the candidates by the number of offices to be filled and dividing the result

so obtained by two. If more candidates receive a majority than there are offices to be filled, those of such candidates receiving the highest total of votes shall be elected, to the number required to fill all of the offices.

Plaintiffs' expert, Dr. Engstrom, has correctly explained that the statute creates a "sliding minimum vote requirement," that is a type of majority vote requirement. Dr. Engstrom has properly termed it "sliding" because it is possible, using the required formula, for a candidate to have obtained more than fifty percent of the votes and still not have met the minimum vote required to be elected. It is also possible for a candidate to obtain somewhat less than a majority and still meet the minimum vote requirement if a great many voters vote for fewer than the available seats.[27]

The general effect of Gretna's majority vote requirement, because it requires more than a simple plurality, is to make it less likely that the candidates of any identifiable voting minority will ever win elections. This generally adverse effect on any cohesive voting minority is enhanced if racial polarization in voting patterns also exists. Accordingly, the Court finds that the majority vote requirements act as a continuing practical impediment to the opportunity of blacks in Gretna to elect candidates of their choice.

*Racial Polarization in Voting*

Statistical evidence presented by duly qualified expert witnesses for plaintiffs and supplemented to some degree by direct testimony of lay witnesses, establishes that racially polarized voting exists in Gretna in a persistent and severe degree. To analyze the existence and extent of racially polarized voting in the City of Gretna, Dr. Richard Engstrom and Professor Michael McDonald,[28] duly qualified expert witnesses

---

**27.** There are no prohibitions against single-shot voting in Gretna. LSA–R.S. 18:522. That is, there is no requirement that voters vote for a full slate of candidates on the ballot.

**28.** Sometime after the hearing of this case, Michael McDonald notified the Court through plaintiffs' counsel, that though his testimony

given in court may have led the Court to believe he had received the Degree of Doctor of Philosophy (Ph.D.), in fact he had not received such a degree. In a prepared affidavit, McDonald noted that while he had passed all requirements for the Ph.D., including a successful defense of his dissertation, he had not completed the formal submission of the final form of dissertation for

for plaintiffs, collected data from every election in which Gretna voters had the opportunity to vote for a black person focusing attention mainly on the 1977 and 1979 aldermanic elections. Based upon two complementary methods of analysis of the collected data—correlation and regression analysis and homogenous precinct analysis [29]—combined with a related descriptive analysis to test for a mistaken inference, Drs. McDonald and Engstrom summarized, and the Court concludes for reasons which follow, that within each of the elections analyzed, racial polarization existed in a significant degree.

## Quantitative Evidence

Although election returns are available as far back as 1960, statistics on registration and turnout by race and precinct are only available after 1975 for Gretna. Therefore, of the four elections in which blacks ran for alderman, only two were capable of quantitative analysis: the elections of 1977 and 1979.

Voters in Gretna vote in 13 precincts, the boundaries of which are set by parish ordinance. Three of the 13 precincts in the 1977 and 1979 elections were honmogeneous white precincts with populations of ten or fewer black voters.[30] Four of the pre-

administrative purposes. Upon learning of this, plaintiffs have moved the Court to requalify Michael McDonald as an expert. Defendants do not object to Professor McDonald's requalification.

Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Although Professor McDonald at the time of trial did not hold a Ph.D., Federal Rules of Evidence 702 *does not require the possession of a Ph.D. to qualify an expert.* The language of the rule is such that experience, training, and education are items the Court may consider in its determination of whether a witness qualifies as an expert. McDonald's affidavit attests to the fact that he has spent eight and one-half years since 1977 working as a professional political scientist. He has worked exclusively as a university level teacher and researcher in the Political Science Departments at the University of New Orleans (U.N.O.) and currently at the State University of New York-Binghamton. His teaching responsibilities include the areas of legislative politics and data analysis for politics and policy. Along with teaching, he has also conducted research concerning representational politics and data analysis. He has also published three scholarly articles, co-authored with Dr. Engstrom, concerning black representation in the electoral structure which have received strong praise and acceptance in the political science field.

Other relevant aspects of his work include the data analytic task performed for Section 2 litigation in jurisdictions other than Gretna. McDonald attests and the Court accepts that he has been involved in the data base preparation, computer program writing, and data analysis for Section 2 litigation in: (1) Norfolk, Virginia—heard and decided; (2) Sarasota, Florida—

heard and decided; (3) Blytheville, Arkansas—settled out of court; (4) Yonkers, New York—settled out of court; (5) New York City, New York—heard and decided; and (6) Washington County, Mississippi.

In sum, the Court finds that Professor McDonald's professional career suggested an ability to perform capably in assisting the Court's interpretation of evidentiary questions concerning the patterns of racially polarized voting in Gretna. Accordingly, a review of McDonald's affidavit as well as the attached articles show that he is overwhelmingly qualified by knowledge, skill, and training to be an expert in this area.

**29.** Dr. Engstrom and Professor McDonald have appropriately noted:

"Two analytic procedures for estimating the magnitude of group differences have been commonly relied upon by the expert witnesses in vote dilution cases. One approach is simply to examine levels of participation and voting behavior within "homogeneous" precincts of a particular political jurisdiction. Homogeneous precincts are those in which all or almost all of the potential voters are members of the particular racial or language minority group. The other approach is to utilize a more general statistical procedure known as correlation and regression analysis. The major advantage of this approach is that information about voting behavior in all of the precincts in a political jurisdiction, or some specific geographical area, is incorporated into the analysis."

See Note, *Quantitative Evidence in Vote Dilution Litigation: Political Participation and Polarized Voting,* 17 Urban Lawyer, 369, 371 (1985).

**30.** Precincts are considered to be homogeneous if over 90 percent of the population, voting age population, or registered voters (depending on which data are available) residing in the precinct are members of the minority group; or

cincts have less than ten percent registered black voters. They are Precincts 4 and 4A of Ward 1, Precinct 3 of Ward 2, and Precinct 1 of Ward 3. Two of the precincts (Precincts 3 and 3A in Ward 1) have had a majority black population at least since 1976.

Analysis of the 1977 and 1979 election returns precinct by precinct reveals that while black voters are estimated to have voted for the black candidate at a rate of 60 to 67 percent, white voters were estimated to have voted for black candidates at a rate which ranged from a low of .9 percent (less than one percent) to a high of 12 percent.

Since there were so few aldermanic elections in which major black candidates ran, plaintiffs' experts analyzed the other five elections in which Gretna voters had the opportunity to vote for a black candidate.[31] In the four elections capable of quantitative analysis, the following percentages of black and white voters voted for the indicated black candidate:

| Election | White (%) | Black (%) |
|---|---|---|
| 1984 - Jackson | | |
| * Unweighted | 1.6 | 95.5 |
| * Weighted | 1.7 | 95.3 |
| 1979 - Jeffers | | |
| Unweighted | 7.5 | 70.1 |
| Weighted | 7.9 | 70.1 |
| 1979 - Jones | | |
| Unweighted | 1.0 | 60.0 |
| Weighted | 0.9 | 65.7 |
| 1977 - Jones | | |
| Unweighted | 11.2 | 65.1 |
| Weighted | 12.0 | 67.2 |

* The term "unweighted" as used here means that each precinct in Louisiana was treated as an equal unit in determining these values, re-

gardless of the actual number of votes cast in those precincts. The term "weighted" is used to take into account differences in the number of votes across precincts.

In general, almost 80% of white voters did not vote for any black candidates in these five elections.

Plaintiffs' experts testified at some length concerning their methods of analysis—Homogeneous Precinct Analysis and Correlation and Regression Analysis. Since expert witnesses rarely rely solely on homogeneous precinct analyses to estimate the differences in voter participation and preferences, and because estimates of group differences in voting behavior can be derived from this procedure without homogeneous precincts being present, the Court will discuss plaintiffs' use of Correlation and Regression Analysis first. See generally, note, *Multiple Regression in Legal Proceedings*, 80 Col.L.Rev. 702 (1980).

*Correlation and Regression Analysis*

Correlation and regression analysis is used to determine the degree of relationship between two variables, such as the racial composition of the precincts in a city or district and the electoral support provided a particular candidate or group of candidates within those precincts. The independent variable in the analysis is a summary measure of the race of the voters in each precinct (usually the percentage of blacks among the total population, voting age population, or registered voters). The dependent variable is the percentage of voters in each precinct casting ballots for the specific candidate or group of candidates. Correlation and regression analysis provides statistical coefficients that summarize the consistency and strength of the relationship between the two variables.[32]

conversely, less than 10 percent are members of the minority group.

**31.** In three of these elections, two black candidates, Larry Napoleon Cooper and Sylvester Brown, drew so little voter support from blacks or whites that they were not included in the analysis. (Cooper, who ran twice, once for Lieutenant Governor and once for Senator, is apparently a fringe candidate, and Sylvester Brown withdrew before the election was held.) The other two elections were the 1984 presidential primary in which Jesse Jackson ran and a 1979

race by Ben Jeffers for Secretary of State of Louisiana.

**32.** The correlation coefficient, which is reported as "r," is a measure of how consistently the scores for a dependent variable (the percentage of voters supporting the black candidate) vary with the independent variable (the black proportion of the voting age population. Both plaintiffs' experts testified that if the percentage of voters supporting a candidate or a group of candidates in the various precincts tends to increase as the black percentage of the voting age

Plaintiffs' experts demonstrated that they were keenly aware of criticism that has been leveled at statistical analyses of racial polarization, coming mainly from Judge Higgenbotham in *Jones v. City of Lubbock, Texas,* (special concurrence), 730 F.2d 233 (5th Cir.1984). They do utilize the "r" factor, which is the statistic complained of by Judge Higginbotham, to provide a measure of how consistently the percentage of votes received by the black candidate varies with the percentage of voters who are black, but they also utilized a "b" factor which illuminates the degree to which voting patterns are racially polarized to *how much* the support for the black candidate varies with the racial composition of the electorate. Thus an "r" reading which approaches 1 shows that the correlation between an increase in the number of black voters and votes for the black candidate is very consistent. The "b" reading shows how much with every one percent increase in the percentage of black voters, the vote for the black candidate increases. The experts explained, they then find the standard error of the "b" to determine the degree of confidence. If the standard error of the "b" is at least twice the "b," the "b" is considered to be a reliable estimate. Thus, if the "white voters split their vote 50–50," the "b" figure ·would correct the impression of high correlation which would show up in the "r" if "the minority voters voted as a bloc." *See Jones,* 730 F.2d at 235. The experts also derive their estimates of percentage of black and white voters voting for the black candidate from the same regression analysis. (See Plaintiffs' Exhibit 64 attached.)

Using charts (Plaintiffs' Exhibits 59 and 63), plaintiffs' experts have very carefully demonstrated to the Court how correlation and regression analysis is applied to the 1977 and 1979 aldermanic elections, respectively. Within plaintiffs' Exhibits 59 and 63, the independent variable reflected on the horizontal axis is the percentage of the voting age population (reflected as "Adjusted Black % of Registered Voters for 1977), which is black in each of Gretna's thirteen precincts. The dependent variable, reflected on the vertical axis, is the percentage of voters in each of the precincts who voted for Jones. Every precinct in the City (depicted by triangles) is located within the figure (called a scatterplot) according to its scores on these two variables. As recorded on the scatterplot itself, the value of the correlation coefficient for Jones' vote in 1977 and 1979 is .926 and .963, respectively; that is, an almost perfectly consistent pattern existed in which the percentage of voters supporting Jones increased as the black percentage of the voting population increased.

Whereas the correlation coefficient summarizes how consistently the electoral support for a candidate or group of candidates varies with the race of the voters in the precincts, the regression coefficient "b" estimates how much that support varies with the racial composition of the precinct electorates. In plaintiffs' Exhibits 59 and 63 (see attached), the value of "b" is the slope of the line that has been drawn through the points in the scatter plot. Plaintiffs' experts explained that this regression line is the straight line that fits the points (or triangles) the best, meaning

population in these precincts increases, then there is a positive relationship between the two variables. Thus, if the percentage of voters supporting a candidate or group of candidates tends to decrease as the black percentage of the voting age population increases, then the relationship is negative. The more consistent the tendency, the greater the magnitude of the correlation coefficient. The value of "r" can range from + 1.0 (a perfectly consistent positive relationship) through 0.0 (no relationship) to − 1.0 (a perfectly consistent negative relationship).

A second coefficient, the one that illuminates the degree to which voting patterns are racially

differentiated, is the unstandardized regression coefficient, commonly reported as "b." This coefficient provides an estimate of how strongly two variables are related; that is, to what extent the scores for a dependent variable can be expected to change in response to changes in the scores for an independent variable. Whereas the correlation coefficient summarizes how consistently the electoral support for a candidate or group of candidates varies with the race of the voters in the precincts, the regression coefficient estimates how much that support varies with the racial composition of the precinct electorates.

no other straight line could be drawn such that the combined distances or deviations between each of the points and the line would be less than they are for these regression lines. The slope of the regression line provides an estimate of the strength of the relationship between the two variables; the greater the slope, the stronger the relationship.

The "b" for the relationship depicted in the 1977 election is .539. Based on this regression line, it is estimated that every increase of 1.0 percent in the black portion of the voting population across precincts tended to result in a .539 increase in the percentage of voters supporting Jones. In other words, if the black proportion of the voting population in one precinct was 50 percentage points higher than in a second precinct, the percentage of voters supporting Jones in that precinct would be expected to be about 27 percentage points higher (50 × .539) than in the second precinct. The correlation and regression coefficients for this example demonstrate that the electoral support for Jones across precincts in Gretna in 1977 was strongly and consistently related to the racial composition of those precincts.[33]

*Homogeneous Precinct Analysis*

Dr. Engstrom and Professor McDonald then proceeded to subject their analysis to the second step in their method—homogeneous precinct analysis. The conclusion that Mr. Jones received only a small proportion of the votes cast by whites in the 1979 elections is corroborated by an investigation of the votes cast in the homogeneous white precincts. In 1979, no black person voted in Precinct 4A of Ward 1, only one black person voted in Precinct 3 of Ward 2, and only two blacks voted in Precinct 1 of Ward 3. Of the 1,458 votes cast for aldermanic candidates across these three precincts, the black candidate received 22 or 1.5 percent. In each of the precincts that were homogeneous and white in 1977 (Precincts 4 and 4A in Ward and Precinct 1 in Ward 3), a total of 13 blacks were registered to vote. Jones finished last among the twelve candidates.

Although there are no homogeneously black precincts in Gretna, a separate analysis of the vote in the two majority black precincts (Precincts 3 and 3A in Ward 1) supports the conclusion that in 1979 the black candidate received over 60 percent of the votes cast by blacks. In these two precincts, 759 people turned out to vote in 1979, 482 of whom (63.5 percent) were black. Six hundred forty-two voted in the aldermanic contest. Assuming that each racial group "rolled off" at an equal rate,

**33.** The same arithmetic can be done for the 1979 election (50 × .590 = 29.5) to show that the black proportion of the voting population was 50% points higher than in a second precinct, the % of voters supporting Jones in that precinct would be expected to be about 29.5 percentage points higher than in the second precinct.

The regression line in the 1977 and 1979 aldermanic charts not only provides an estimate of the strength of the relationship between the variables, it also can be used to provide estimates of the actual percentages of black and non-black voters supporting any particular candidate or group of candidates. These estimates are based on "intercepts," the points at which the line crosses the left and the right vertical axes of the scatterplot. The left intercept provides an estimate of the percentage of voters supporting a candidate in a precinct in which no black people would have voted, while the right intercept provides an estimate for a precinct in which only blacks would have voted. Intercepts allow one to compare (as was done through homogeneous precinct analysis) the percentage of both minority group voters and nonminority group voters favoring a particular candidate. The values of the intercepts reported in the 1977 election suggests that Jones received the votes of only 0.1 percent of the voters in Gretna who were not black, while he was supported by 65.1 percent of those who were black.

The values of the correlation coefficient, regression coefficient, and intercepts reported in the 1977 chart are based on "unweighted" correlation and regression, meaning each precinct in Gretna was treated as an equal unit in determining these values, regardless of the actual number of votes cast in these precincts. This type of analysis can also be "weighted" to take into account differences in the number of voters across precincts, so that the influence each precinct has on the values of the summary coefficients varies by the size of the vote cast within that precinct. See, Plaintiffs' Exhibit #64 for results of regression analysis in the 1977 and 1979 aldermanic elections.

and that the white crossover vote for the black candidate in these two precincts was the same as the city wide estimate (1.0 percent), then Jones is estimated to have received 2 of the 238 votes cast by whites in these precincts and 273 of the 414 votes cast by blacks, or 65.9 percent of the black vote.

*Additional Proof*

Generally, where the results of the regression analysis are confirmed by a separate investigation of the homogeneous precincts, that is where the "b" indicates the strength of the increase, the "r" confirms the consistency of the increase, and the standard error of the "b" is at least twice the "b," no further investigation is necessary. No data have appeared to suggest that the inferences made are incorrect. Nonetheless, Drs. Engstrom and McDonald performed a further analysis to determine whether a mistake could have been made in their regression analysis by perhaps inferring incorrectly from aggregate data to describe individual behavior (such as particular voting decisions). Such incorrect inferences are said to suffer from the "ecological fallacy," another subject cautioned against by Judge Higginbotham. However, plaintiffs' experts also considered a series of Census Bureau charts and tapes of income and education data relating to the three homogeneous white precincts, 4A in Ward 1, 3 in Ward 2, and 1 in Ward 3.[34] Precinct 4A in Ward 1 turned out to be coterminous with a block group for which extensive data was available. Plaintiffs' experts were able to conclude that although there was a wide range of income levels in Precinct 4A, it clearly contained the most affluent sections of the city. Precinct 3, Ward 2 provided data which in Dr. McDonald's estimate suggested a middle level income area. That is, not very many poor families show up in the income range data, but there are no families with incomes above the $50,000 bracket. For Precinct 1, Ward 3, Dr. McDonald studied housing and rental data as well as family income. He concluded that this last precinct was a distinctly low income area. Thus, he concluded that the homogeneous white precincts could be classified as poor, middle class and affluent. Despite their differences, the white population of these three precincts had one thing in common. Virtually no one voted for the black candidate. From this, the experts concluded that there was no reason to assume that whites in the mixed precincts had behaved any differently from whites in the homogeneous precincts.

In conclusion, plaintiffs' experts analyzed voting to determine if it was polarized by using a bi-variant regression analysis. By using computers, they studied percentages of black voters who voted for the black candidate and precinct size. Their analyses of various kinds of income data for the homogeneous white precincts was descriptive, not quantitative. It was their testimony that racial polarization is a concept in political science which describes a situation where, for whatever reason, blacks are voting one way and whites are voting another. To determine that such a pattern was occurring is properly the task of bi-variant regression analysis.

Defendants, in an effort to rebut plaintiffs' claims that voting in the City of Gretna was racially polarized, relied heavily, if not exclusively, on the testimony of Dr. John Wildgen, a political science professor at the University of New Orleans, who was qualified by this Court as an expert in computer applications, political behavior and comparative politics. Dr. Wildgen concluded that Gretna's "at-large" system of electing aldermen did not result in a dilution of black voting strength. He concluded that Gretna's elections are not characterized by racial polarization.

Notwithstanding the fact that no black person has ever been elected to alderman, Dr. Wildgen contends that the elections in which blacks have vied for seats on the Board of Aldermen were not characterized

---

**34.** Data from the Census Bureau is frequently only available in block level groups which may or may not be the same geographical shape as the precinct would appear on a map.

by racial polarization. The evidence clearly belies such a contention.

In earlier studies on voting behavior in Orleans Parish, "The City of New Orleans' 1976 Elections," and "A Political Problem of Public Education in New Orleans," Dr. Wildgen, employing the statistical tools of bivariant regression analysis, concluded that racial polarization existed amongst the voters in New Orleans.

Contrary to previous publications and testimony, Dr. Wildgen now contends that regression analysis is inappropriate for measuring racial polarization. According to Dr. Wildgen, one must conduct a multivariant analysis, taking into consideration not only the registration by race in each precinct and the precinct elections returns, but also, religion, income, media coverage, etc. He also encourages the use of survey data. While multi-variant analysis and survey data may prove helpful in determining whether racial polarization exists, they too are not dispositive on the issue and in no way negate the use of bi-variant regression analysis to determine whether in fact polarization exists.

Race-conscious politics is, as it has been since blacks were allowed to vote, one of the main issues in Gretna politics. Perhaps most telling on the issue of racial polarization is the evidence put forth concerning the campaign of Edwin Romain for the 1973 aldermanic election. In determining whether racial polarization exists in an election scheme, Judge Higginbotham has correctly stated:

> The inquiry is whether race or ethnicity was such a determinant of voting preference in the rejection of black or brown candidates by a white majority that the at-large district, with its components, denied minority voters effective voting opportunity.

*Jones v. Lubbock*, 730 F.2d at 234 (special concurrence). Judge Higginbotham's in-quiry takes on special significance when studied in the context of the 1973 aldermanic race. In that election, Romain, a light-skinned black, ran for alderman against 13 non-incumbent white candidates. During the race, a meeting of the candidates was called by Chief Miller to form the Miller-White slate. All 13 white candidates were invited; Romain was not. Romain testified he approached several of the incumbent aldermen seeking their support. He was told that the person to see was Chief Miller. When he spoke to Chief Miller, he was informed that he could not be on the slate, that he was not needed to get the black vote.

Later, Romain testified that he directed considerable campaign effort toward the white residents of Gretna. He testified that he was not known in the white community; that white voters did not realize he was black. Moreover, to enhance his chance of getting white votes, Romain went door to door with his two light-skinned daughters who, he testified, "were the most adapted to white ways." He chose not to campaign with his darker complected sons. He was well received in the white community. In the primary election, Mr. Romain finished sixth out of seventeen candidates, enough to qualify him for the runoff election.

The ploy used by Romain to gain valuable white support for his campaign came to an abrupt end after the primary. A newspaper article was published between the primary and the runoff stating that if elected, Romain would be the first black person to serve on the Board of Aldermen in Gretna. The evidence suggests that this revelation had severe consequences for Romain since his race had not been previously mentioned by the press. The apparent results of the jolting news were that Romain finished first and second in the majority black precincts and last in every other precinct in the City, to finish last in the race.[35]

---

35. Because of the lack of registration and turnout data prior to 1976, Dr. Engstrom was unable to subject Romain's race to a quantitative analysis. He did look at the returns closely and provided a descriptive analysis. In the 1973 election Romain competed with 16 other candidates in the primary election. Two of the five seats on the Board were filled as a result of the voting in the first primary election, and six candidates, including Romain, competed in a

In *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012 (1982), Justice White, speaking for the Court, observed that "[v]oting along racial lines allows those elected to ignore black interests without fear of political consequences, and without bloc voting the minority candidates would not lose elections solely because of their race." There is but one sad and inevitable conclusion: Romain lost for the most part because of his race.

*Ultimate Findings of Fact*

The totality of relevant circumstances found by the Court—lingering effects of years of official discrimination against black citizens in matters touching registration and voting, substantial polarization in voting, a relatively depressed socio-economic status resulting in significant degree from a century of both *de jure* and *de facto* segregation, and the continuing effect of a majority vote requirement through use of an "unusually large" election district—results in the submergence of black registered voters in the City of Gretna as a voting minority with substantially less opportunity than other members of the electorate to participate in the political process, thereby depriving the black voters of their lawful right to elect representatives of their choice.

## CONCLUSIONS OF LAW

This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 1973j(f) and 28 U.S.C. §§ 1331, 1343, 1344, 2201 and 2202.

Plaintiffs seek relief under both the Voting Rights Act of 1965, 42 U.S.C. 1973, *et seq.* as amended, and also under the Fourteenth and Fifteenth Amendments of the United States Constitution.

Although plaintiffs allege both a statutory violation and a constitutional claim, the Section 2 violation must be adjudicated first. *McMillan v. Escambia County, Fla.*, 638 F.2d 1239 (5th Cir.1981), *vacated*, 466 U.S. 48, 104 S.Ct. at 1577 (1984), *aff'd*, 748 F.2d 1037 (5th Cir. Dec. 19, 1984); *Lee County Branch of NAACP v. City of Opelika*, 748 F.2d 1473, 1478 (11th Cir.1984); *Major v. Treen*, 574 F.Supp. 325 (E.D.La. 1983). A finding of a Section 2 violation would then obviate the necessity to address plaintiffs' constitutional claims. *Lee County*, 748 F.2d at 1478.

Section 2 of the Voting Rights Act of 1965, as amended provides:

a) No voting qualification or prerequisite to voting, standard, practice or procedure shall be imposed or applied by any state or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color....

42 U.S.C. 1973.

The "at-large" system of electing aldermen in the City of Gretna is maintained by defendants under color of state law of the State of Louisiana.

The Voting Rights Act further provides:

b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the processes leading to nomination or election in the state or political subdivision are not equally open to participation by members of a class of citizens protected by section (a) of this section in its members have less opportunity than other members of electorate to participate in the political process and to elect representatives of their choice....

42 U.S.C. § 1973.

---

second, runoff primary for the remaining three seats.

Mr. Romain's best performance in the first primary was his fourth place finish among the candidates in precincts 3 and 3A in Ward 1, the only two precincts in Gretna in which blacks constitute a majority of the registered voters (at least since 1976). However, when the contest was reduced to six candidates seeking the three

remaining positions on the Board, Mr. Romain finished first in precinct 3A of Ward 1, second in precinct 3 of Ward 1, and last in every other precinct in the City. He was therefore last overall. Engstrom concluded that the returns showed a pattern of racially polarized voting in the 1973 election as well. The foregoing analysis confirms Mr. Romain's testimony regarding his election.

The Voting Rights Act was intended to apply to vote dilution cases.[36] *United States v. Marengo County Board of Commissioners,* 731 F.2d 1546, 1556 (11th Cir. 1984).

The Senate Report on the 1982 amendment to the Voting Rights Act expressly states that the purpose of the amendment was to eliminate the requirement that plaintiffs prove a discriminatory intent. Instead, the amendment substituted a "results" test, based upon a totality of circumstances analysis. S.Rep. No. 1992, 97th Cong., 2d Sess. 15 (1982).

The language of Section 2(b) supplemented by its legislative history provided the standard of proof for finding a Section 2 violation. The Senate Report delineates specific factors which a court should consider in determining whether the Section 2 violation has occurred.

The report lists the factors enunciated in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub. nom., East Carroll Parish School Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam) which articulates the standard *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) established:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot voting provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority have been denied access to that process;

5. the extent to which the members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinders their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.[37]

The Senate Report makes clear that while factors it lists are often the most relevant considerations, they are not exclusive and thus not controlling. The factors are not "to be used as mechanical 'point counting' device[s]." S.Rep. at 29, U.S. Code Cong. & Adm.News 1982, p. 207. Moreover, a litigant need not prove all, or even a majority, of the factors to establish a Section 2 violation. *Id.* "The failure of plaintiff to establish any particular factor, is not rebuttal evidence of non-dilution." *Id.* The relevant factors are only a guide to help the Court determine whether "based on the totality of circumstances ... the voting strength of minority voters is

---

**36.** The Act applies to any voting practice or procedure which results in discrimination on the basis of race, color or membership in a language minority group. 42 U.S.C. § 1973, amended by Pub.L. No. 97–205, § 3, 96 Stat. 131, 134 (1982) (codified at 42 U.S.C.A. § 1973 (West Supp.1983)). See also 128 Cong.Rec. S6500 (daily ed. June 9, 1982) (statement of Sen. Stevens, a co-sponsor of the Amendments).

**37.** S.Rep. at 28–29, U.S.Code Cong. & Adm.News 1982, pp. 206, 207. The Report indicates two additional factors that in some cases have had

probative values as part of plaintiffs' evidence to establish a violation:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;
[and]
whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Id.*
The plaintiffs have not made responsiveness an issue for purposes of this litigation.

... 'minimized or cancelled out.' " *Id.* See, *United States v. Marengo County*, 731 F.2d 1546, 1567 (11th Cir.1984); *Gingles v. Edmisten*, 590 F.Supp. 345, 355 (E.D.N.C.1984) (discussion of polarized voting).

A finding of a history of official discrimination permits the conclusion that this discrimination contributed to less frequent and less effective minority participation in the political process. *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012 (1982); *Jones v. City of Lubbock*, 727 F.2d 364, 383 (5th Cir.1984); *McMillan v. Escambia County, Fla.*, 748 F.2d 1037, 1043 (5th Cir.1984); *United States v. Marengo County*, 731 F.2d at 1567 (11th Cir. 1984). The record in the case at bar clearly supports a finding of a history of official discrimination within the State of Louisiana and the City of Gretna.

Although no factor is indispensible, the legislative history of the amendment to Section 2 indicates that racially polarized voting will ordinarily be the keystone of a dilution case. *McMillan v. Escambia County, Fla.*, 748 F.2d at 1043 (5th Cir. 1984); *United States v. Marengo County Commission*, 731 F.2d at 1566.

Although racial polarization is defined as *beginning* where blacks and whites vote differently from each other in relation to the race of the candidates, it is "the demonstrable unwillingness of substantial numbers of the racial majority to vote for any minority race candidate or any candidate identified with minority race interests [that] is the linchpin of vote dilution by districting." *Gingles v. Edmisten*, 590 F.Supp. at 355.

Unless it can be shown that an election occurred in which a white candidate ran on issues strongly affecting the black community and with an open, positive and strong identification with the black community—which has not been shown in this matter—candidacies of black persons are the proper focus of inquiry concerning the extent to which elections are polarized.

Indeed every case reviewed by this Court utilized analysis of elections where blacks have run for office to determine whether racial polarization exists. See generally, *Major v. Treen*, 574 F.Supp. 325 (E.D.La. 1983); *Gingles v. Edmisten, supra; Jones v. Lubbock, supra; McMillan v. Escambia County, Fla., supra;* and *Johnson v. Halifax County*, 594 F.Supp. 161 (E.D.N.C. 1984) noting:

8. Evidence of racially polarized voting is at the root of a racial vote dilution claim because it demonstrates that racial considerations predominate in elections and cause the defeat of minority candidates or candidates identified with minority interests. *Gingles* described the essence of a vote dilution claim as follows: "primarily because of the interaction of substantial and persistent racial polarization in voting patterns (racial bloc voting) with a challenged electoral mechanism, a racial minority with distinctive group interests that are capable of aid or amelioration by government is effectively denied the political power to further those interests that numbers alone would presumptively give it in a voting constituency not racially polarized in its voting behavior."

In other words, absent racial bloc voting an at-large system would not ensure the consistent defeat of minority candidates or candidates associated with minority interests.

*Halifax County*, 594 F.Supp. at 170 (footnote and citations omitted).

By and large the cases assume that racial polarization begins with mathematical correspondence between race of candidate and race of voters voting for that candidate. When evidence shows persistent patterns of racial bloc voting, courts have found racial polarization or polarized voting. *Major v. Treen*, 547 F.Supp. at 338; *Gingles v. Edmisten*, 590 F.Supp. at 367–372; *Johnson v. Halifax County*, 594 F.Supp. at 166; *McMillan v. Escambia County, Fla., supra.*

The Court concludes as a matter of law that neither Romain's nor Jones' candidacy were token. In demonstrating campaign expenditure, appeal to the white communi-

ty, campaign strategy, public name recognition and exploring the effect income has on the votes of white persons, plaintiffs have provided the "common sense and intuitive assessment" noted by Judge Higginbotham to show that the black candidates did not run token races. *Jones v. Lubbock*, 730 F.2d at 236 (special concurrence).

The "sliding minimum vote requirement" mandated in LSA–R.S. 18:511 and currently in effect in the City of Gretna is a form of majority vote requirement. The effect of this system is particularly egregious since a candidate receiving votes from more than 50% of all the voters may still lose the race. This kind of majority vote requirement tends to dilute the political strength of minority groups. *Jones v. City of Lubbock*, 727 F.2d at 383; *Rogers v. Lodge*, 102 S.Ct. at 3281. In addition to this majority vote requirement, the at-large system of election, with no district residency requirement, serves to effectively destroy the political voice of Gretna's minority population. See *Rogers v. Lodge*, 102 S.Ct. at 3281; *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 1877, 29 L.Ed.2d 363. "Even under the best of circumstances, at-large districts tend to debase the value of a minority's political strength." *Jones*, 727 F.2d at 383. Gretna is the largest municipality within the State to maintain the at-large system. Despite a nearly 30 percent black population, no black person has ever been elected to office in the City of Gretna. This system, coupled with a majority vote requirement and no residency requirement serves to enhance the opportunity for discrimination against minorities in Gretna.

The City of Gretna has a long history of political control by one group—the "Miller-White" Ticket—which engages in an informal process of slating which discriminates against black persons. In jurisdictions where there is an influential official or unofficial slating organization, the ability of minorities to participate in that slating organization and to receive its endorsement may be of paramount importance. In *White v. Regester*, for example, the Supreme Court found it significant that only two blacks had ever been endorsed by the

Dallas County Committee for Responsible Government, "a white dominated organization that is in effective control of Democratic Party candidate slating in Dallas County." *Marengo* at 1569.

While the Miller-White faction is unconnected to any official national party, it is in effective control of candidate slating in Gretna. The Miller-White faction is admittedly unofficial, but the *Marengo* court clearly regards that distinction as irrelevant. No blacks have ever been endorsed by the Miller-White group. One black person testified that he had been excluded openly on the basis of his race.

Blacks in Gretna suffer greater socio-economic deficiencies in comparison with whites in Gretna. This is a result of a legacy of discrimination in public and private facilities, education and employment and effects the ability and opportunity of blacks to participate effectively within the electoral scheme. *McMillan v. Escambia County, Fla.*, 748 F.2d at 1044; *Jones v. City of Lubbock*, 727 F.2d at 383; *Gingles v. Edmisten*, 590 F.Supp. at 361; *Zimmer v. McKeithen*, 485 F.2d at 1306. Congress indicated that plaintiffs are not required to show a causal connection between depressed socio-economic status and decreased opportunity to effectively participate in the political process. *Major v. Treen*, 374 F.Supp. at 341; *Gingles* at 363, f.n. 23; *United States v. Marengo*, 731 F.2d at 1567. The burden is upon defendants to show that this causal nexus does not exist, and that reduced participation is attributable to some other factor. *McMillan*, 748 F.2d at 1044; *Marengo* at 1568, 1569; *Cross v. Baxter*, 604 F.2d 875, 881–882 (5th Cir.1979). Defendants have made no such showing.

Since its incorporation in 1913, Gretna has never had a black elected official. In *McMillan v. Escambia County, supra*, the Fifth Circuit on remand from the Supreme Court affirmed the finding of the trial court that the at-large system by which the county elected its commissioners effectively diluted minority voting strength, in viola-

tion of Section 2 of the Voting Rights Act. The absence of any black elected officials in an at-large scheme "is, of course, evidence of vote dilution." *Marengo,* 731 F.2d at 1571. *See White v. Regester, supra; Zimmer v. McKeithen, supra.*

The record shows that only three times in Gretna's history have blacks run for office, and two of those attempts were made by the same individual. "[T]he lack of black candidates is a likely result of a racially discriminatory system." *McMillan,* 748 F.2d at 1045.

A consistently high degree of electoral polarization in Gretna was proved through statistical and anecdotal evidence. Particularly as enhanced by Gretna's majority vote requirement, *see Major v. Treen,* 574 F.Supp. 351, n. 32, racial bloc voting substantially impairs the ability of black voters in Gretna to become fully involved in the democratic process. *Id.*

State law no longer requires the maintenance of the at-large system. The policy underlying the preservation of this system in Gretna is not relevant in determining whether there exists a violation of Section 2. As cited recently by the Fifth Circuit: "Particularly in light of the diminished importance [the tenuousness of state policy] factor has under the results test, we doubt that the tenuousness factor has any proba-

tive value for evaluating the 'fairness' of the electoral system's impact." *Jones v. City of Lubbock,* 727 F.2d at 383 (citations omitted).

In sum, application of amended Section 2's "results" test to the aggregate of the facts adduced at trial, including Gretna's history of discrimination and the impact of that history on the present ability of blacks in Gretna to join in the political process, the vestiges of discrimination which take the form of a marked disparity in the socio-economic conditions under which blacks and whites currently subsist, and the parish's racially polarized voting, as exacerbated by its majority vote requirement, preponderates in favor of the plaintiffs.

Accordingly, the further use of the at-large system for the election of the Board of Aldermen within the City of Gretna is hereby prohibited. Defendants shall, within 30 days, submit to the Court a proposed new plan for electing persons to the Board of Aldermen and simultaneously serve a copy of same upon plaintiffs' counsel. Obviously, it would be in the best interests of all citizens if the parties can reach an agreement on one plan. If not, the Court will review the proposal and issue whatever further orders it deems necessary at that time.

POLARIZATION – JONES (B)
1979 Aldermanic Election

r = .963
b = .590
(.050)

Int. = 60.0

Int.= 1.0

JONES % OF VOTES

BLACK % OF VOTERS

Legend
△ JONESP

Regression

POLARIZATION – JONES (B)
1977 Aldermanic Election Adjusted for Turnout

r = .926
b = .539
(.066)

Int. = 65.1

Int. = 11.2

JONES % OF VOTERS

ADJUSTED BLACK % OF REGSTERED

Legend
△ JONESP

Regression

Results of regression analysis in the 1977 and 1979 aldermanic elections.

| Year | Correlation Coefficient | Unstandardized Regression Coefficient | Standard Error of the b | Intercepts Left (white) Right (black) |
|---|---|---|---|---|
| 1979 Unweighted: | r= .963 | b= .590 | (.050) | 1.0% 60.0% |
| Weighted: | r= .962 | b= .648 | (.002) | 0.9% 65.7% |
| 1977 Unweighted: | r= .926 | b= .539 | (.066) | 11.2% 65.1% |
| Weighted: | r= .908 | b= .553 | (.003) | 12.0% 67.2% |